Ronald D. Jackson
V-70867   Bldg. 1-103 up
P.O. Box 4000   C.S.P.-Solano
Vacaville, CA.
            95696 - 4000



IN THE United States District Court
For The Northern District of California

Ronald D. Jackson
        Petitioner

vs.

D. K. Sisto, Warden
        Respondent

No. C-08-1202 JSW(PR)
Petitioners TRAVERSE;
Points And Authorities
In Support of RELIEF.

Petitioner, Ronald D. Jackson,
Respectfully submits this traverse to Respondent's
ANSWER to the Courts Order to Show Cause.
Petitioner denies the Respondent's Allegations,
and further alleges as follows:

# I
## CUSTODY

Petitioner admits he is in the Custody
of the California Department of
Corrections and Rehabilitation, pursuant
to the Judgement of the San Mateo
Superior Court; However said Judgement
is unlawful and Petitioner is being held
in Violation of Federal Law and the
Constitution of the United States.

# II
## PROCEDURAL ISSUES

Paragraph II, of Respondents Answer is
True. The petition was timely filed pursuant
to 28 U.S.C. § 2244 (d) and Petitioner has
exhausted all State Remedies under 28 U.S.C.,
2254 (b) and (c).

# III
## DENIAL

Petitioner specifically denies Respondent's
Claim that Petitioner is Not entitled to
Relief pursuant to 28 U.S.C § 2254 (d.)
Petitioner is entitled to habeas Corpus
Relief because ;(a) the trial Court Abused

Its Sentencing discreation which is A miscarrage of Justice, thus violating the petitioner's Rights, specifically the sixth and Fourteenth amendments. (2): The Prosecutor partisipated in Prosecutorial misconduct in its use of Deceptive and misleading methods as well Suppressing Exculpatory Evidence. (3); The State failed to produce adequate Evidence to Sustain a Conviction of attempted murder or the use of a firearm. (4); Petitioner was denied Ineffective Assistance of both trial and appellate counsel Both, failed to research a legal Defense based on "Actual Innocence" Petitioner Contends both fail short of the "Strickland Standard."

## IV
## EVIDENTIARY HEARING

Petitioner Requests an evidentiary hearing on his claims, and asserts that his claims of Prosecutorial misconduct, Ineffective Assistance of both trial and appellate counsel's along with his other claims, may not be adequately decided without a hearing on the facts. No State or federal court has held an adequate factual investigation in order to adjudicate these Claims. Petitioner further Request the appointment of Counsel to represent Petitioner at such an evidentiary hearing.

# V

## INCORPORATION

This TRAVERSE is made upon the Petition and State and Federal Records previously filed, as well as the Points and authorities filed herewith,. All of which are incorporated herein by Reference.

# VI

## CONCLUSION

WHEREFORE, for the reasons set forth herein, this Court should grant petitioner Relief by granting the writ of habeas corpus, vacate the Judgement of Conviction with prejudice, and order the discharge of Petitioner within a reasonable time established by the Court, unless the Courts of this State has Reason to Retry the Petitioner within a reasonable time as established by the Court. In the alternative, the petitioner Respectfully Requests that this Court hold an evidentiary hearing and appoint petitioner Counsel pursuant to 18 U.S.C. §3006A(a)(2)(b) and Rule 8(c) of the Rules Governing §2254 Cases.

Date: August 19, 2008

Ronald D. Jackson

# Memorandum of Points and Authorities

## I

Petitioner objects to and denies Respondent's allegations that the trial Court did not violate Petitioner's Constitutional Rights specifically the Sixth and fourteenth Amendments, Also the Petitioner alledges Cruel and unusual Punishment which is in violation of the Eighth Amendment.

Petitioner Contends that his Sentence is in fact a miscarriage of Justice which no civilized Society should or would tolerate and the Court exceeded its Jurisdiction authorized by law. The Due Process clause of the fourteenth Amendment Commands that no man Shall lose his liberty unless the Government has Borne the Burden of Convincing the fact finder of his Guilt to such end, that the reasonable doubt standard is indispensable. for it impresses on the trier of fact the necessity of Reaching a subjective state of certitude on the facts in issue and the use of such standard is indispensable to command the Respect and confidence of the Community in applications of Criminal law diluted by a standard of Proof which leaves People in doubt of

5

Whether innocent men are being condemned.
Petitioner cites (IN RE WINSHIP, 397 u.s.
385 (1970)) when the grounds for Application
are excessive Sentencing or there is a
Fundamental Miscarriage of Justice, No
Justification for delay is necessary, (IN RE CLARK,
(1993) 5 cal. 4th 750, 774, -775. The Petitioner
is Currently Serving a life Sentence with
the possibility of Parole plus 20 years
this Sentence is Excessive to Say the
least.   SEE 18 u.s.c. §§ 3551 - 3673, 28 u.s.c. §§ 991- 998 (2000)
Sentencing Guidelines, Supra note 1. the Sentencing
Reform Act has fundamentally changed the Sentencing
of criminal defendants in Federal Courts. Previous
Law employed an indeterminate sentencing System:
statutes established sentencing limits for different
offenses but nearly always delegated broad
discretion to the Judge in setting an appropriate
Sentence in a specific case. The Parole Commission
then Fixed the actual term of imprisonment by
deciding when the defendant would be released
on Parole. This sentencing System was Criticized
for Creating unwarranted disparity in the Sentences
imposed on similarly situated defendants and
uncertainty in the length of time that defendants
served in Prison. In the Sentencing Reform Act
Congress moved to correct these problems by abolishing
the Parole system and Authorizing the Creation of
a more determinate sentencing method, IN
which the Sentence imposed by a Judge Represents

6

IN PRISON (See S. Rep. No. 225, Supra Note 1, At
39-49, Reprinted in u.s.c.c.A.N. at 3222-32

In This Present Case, the Petitioners
Sentence is in fact "Cruel and unusual
Punishment" And a "Misscarriage of Justice"
The Petitioner's Sentence for all intentional
purpose's is equal to an LWOP "Life
without the Possibility of Parole," Surely
if the federal Court system deemed
Necessary to pass the Sentencing Reform
Act, they expected the State Courts to
Abide by these very Laws? The Petitioner
further Contends, the California Supreme Court
held that any Sentence may be attacked on
Proportionality grounds. The Provision of
The Bill of Rights, which is fundamental and
essential to A fair trial is made obligatory
by and upon the State by the fourteenth
Amendment of the United States Constitution
And the trial Court did in fact deny the
Petitioner his Due Process of Law and this
Petitioner is Now Serving an unauthorized
And illegale Sentence. The Petitioner
Respectfully Request that the Court Vacate
this Sentence And order whatever instructions
to the Lower Courts that are fitting.

7

This Evidence was Insufficient to Support
A Attempted Murder charge with intent
To Kill, thus, the Conviction Violates the Due
Process Clause of the Fourteenth Amendment.

Petitioner Contends, In evaluating the
Sufficiency of this evidence, a Reviewing
Court first "must Resolve the issue in
light of the whole Record ... and Second, ...
must Judge whether the evidence of each
of the essential elements ... is Substantial."
(People v. Brown (1989) 216 Cal. App. 3d 596, 600 (
quoting people V. Barnes (1986) 42 Cal. 3d 284, 303).)
"Substantial evidence" of guilt is evidence
of "ponderable legal significance ... Reasonable
in Nature, Credible and of Solid Value."
      The Due Process Clause "protects the
accused Against Conviction except upon proof
beyond a Reasonable doubt of every fact
Necessary to Constitute the Crime with which
he is charged." (In RE winship (1970) 397 u.s.
358, 364.) If No Rational thier Could have found
all the essential elements of the charged
Crime beyond a Reasonable doubt, the Judgment
Violates due Process And CANNOT Stand.
(Jackson V. Virginia (1979) 443 u.s. 307, 319.)
      Although the Court must View the evidence
in a light most favorable to the Judgement
and presume in support of the Judgement

8.

the existence of those facts the trier of fact could reasonably deduce from the evidence, it cannot limit its review to the evidence favorable to the respondent, and it cannot affirm a Judgement based on speculation or unwarranted inference. (People v. Johnson, Supra, 26 Cal. 3d at p. 576-577 (citations omitted).) When the "Proven facts give equal support to two inconsistent inferences, neither is established." (People v. Brown, Supra, 216 Cal. App. 3d 600.)

Penal Code Section 187, Subdivision (a), states "murder is the unlawful killing of a human being ... with malice aforethought." To prove attempted murder, "there must be sufficient evidence of the intent to commit the murder plus a direct but ineffectual act toward its Commission." (People v. Chinchilla (1997) 52 Cal. App. 4th 683, 690.) Because specific intent is a Requisite element of an attempted murder charge, a conviction cannot be based upon a finding of implied malice (Ibid.) Therefore, "the evidence must demonstrate a deliberate intention unlawfully to kill a fellow human being" A person who intentionally attempts to kill another does not often declare his state of mind either before, at, or after the moment he shoots at the victim. (People v. Lashley (1991) 1 Cal App. 4th 938, 945.) Absent direct evidence, the defendant's intent must be derived from all the Circumstances of the attempt, including

9

This actions and words." (Id. at pp. 945 & 946.)
Whether the defendant possesed the Requisite
intent to Kill is a question for the trier of
fact. (Id at p. 946.)

Here, there is no direct evidence of
Petitioners state of mind. The circumstantial
evidence does not prove beyond a reasonable
doubt that petitioner intended to Kill. No one,
not even Webster Saw the Shooting. Thus, there
is no evidence that a gun was even pointed
at Webster. No casings or projectiles were
Recovered, so there is no evidence that a
gun even discharged live ammunition. The
Record just as easily supports a finding
that the alledged gun fired blanks.

In Sum, although it was argued by
the prosecution, the Record does not
Support a conviction of Attempted murder;
the conviction of Attempted murder must
be Reversed with prejudice

Prosecution's misconduct violated Petitioner's Rights to Due Process of Law by Denying Petitioner Exculpatory Evidence.

The Prosecution has a duty to disclose favorable evidence to the Petitioner encompassing both impeachment material and exculpatory evidence, the Petitioner belives Ms Smith's criminal history was very favorable to the Petitioner, specifically in light of the States weak case. the State relied heavily on Ms. Smith's testimony to make its case. Being that there was no other creditable evidence connecting the Petitioner to the alledged crime considering the context of the entire trial. the failure of the prosecution to provide Petitioner with Ms Smith's criminal arrest history deprived Petitioner of a fair and adequate trial. It still remains a fundamental value, determination of our society, that it's far worst to convict an innocent man, than to let a guilty man go free. (In Re Winship, 397 u.s. 358, 372 (1970). This evidence in petitioners case was far from conclusive, No Gun was ever discovered, No shell caskings were located at the scene. nor was there any bullet holes found. then there is the fact that in Webster's testimony and statements to the police did she ever state that she saw the petitioner with a Gun, nor is she sure

11

where Petitioner can Show, Therefore
this evidence that was denied to petitioner
would have reflected upon Ms. Smith's credibility
(People v. Hays (1992) 3 Cal. App. 4th 1238;
(Monron v. Anpelone, 323 F.3d 286, 314 (4th cir 2003)
Petitioner reiterates his contention that
he has been denied Due Process of the law
(SEE, Rogers v. Richmond, 365 u.s. 534, 545)
the Petitioner Respectfully Request that this
Honorable Court examines this Petition and
acknowledges a fundamental miscarriage of
Justice has been Committed as a result
of the State's Suppression of Ms. Smith's
Criminal history deprived the petitioner
of fair and Affirmative defense. The
Petitioner Request A Reversal or whatever
Actions deemed necessary.

## IV

Petitioner has Suffered Ineffective
Assistance of Both Trial and Appellate
Counsel, which denied him his Rights
gauranteed under the Sixth Amendment.

Petitioner Contends that trial counsel
Mr. Mike Devoy denied his Claim of
"Actual Innocence" Nor did he make any
Effort to impeach the prosecutions Key
witness whom had been inconsistant in
her Statements Alledging that the petitioner
Confessed his Shooting at Ms Webster,
Petitioner Also had informed Mr. Devoy

12.

That Mr. Smith had a criminal record.
Petitioner contends that Mr. Devoy's
Representation fail far below the Standards
set in (People v. Ledesma, (1987) 233 Cal. Rptr.
404, 432) (Strickland v. Washington (1984)
80 L.Ed 2d 674, 693. Petitioner further
Contends Appellate Counsel was ineffective
for failing to Raise Any Arguable issues
on appeal, with appropriate and professional
Representation the petitioner can safely say
the outcome of his trial and appeal would
have been different. Mr. Devoy was
Required by professional Standards to explore
and prepare a potentially meritorious
defense, even if there was legitimate
tactical Reasons for introducing No defensea-
ble Evidence. Petitioner has now been Convicted.
In Violation of the Sixth amendment of
the united States Constitution. which
entitle person's charged with a crime be
presented with adequate Counsel, Mr. Devoys
failure to give Petitioners claim of
Actual Innocence deprived the petitioner
of an adequate defense, trial Counsel
failed even further when he failed to
investigate the witnesses Criminal Arrest
Record for purpose's of impeachment
the Right to the Assistance of Counsel
"encompasses the Right to Effective
Assistance of Counsel (McMann v. Richardson,
397 U.S. 759 (1970).

13

Riffs V. Calley, 464 u.s. 387, Mr. Orvoy's decision not to prepare a innocence defense was based on his "belief" that the Jury would convict, this was not a tactical decision based on any professional standard, and as it turned out the petitioner was still convicted for attempted murder with a firearm. The State relied largely on Ms Smith's testimony to obtain the conviction (see Thompson V. Calderon, 523 u.s. 538 (1995)) also (Dixon V. Snyder, 266 f.3d 693, 704 (7th cir. 2001) the petitioner believes there were many issues that were potentally vulnerable to legitimate attack by a professional attorney with appellate experience, appellate attorney Robert Derham who "acted" as petitioner appellate counsel failed to raise the innocence claim as well as the ineffective assistance of trial counsel claim truly deprived the petitioner of his Constitutional right to a competent advocate (People V. Barton (1978) 21 cal. 3d. 513. The petitioner believes he has more than met the two prong test thats required and petitioner can safely say but for both trial and appellate counsel's unprofessional performance the outcome would have been different. The Petitioner Respectfully Request a Reversal on grounds of Ineffective Assistance of trial and Appellate Counsel.

14.

# CONCLUSION

Petitioner contends that the OVERALL cumulative effect ALONE is worthy of REVERSAL. Yet when the claims are consolidated, they are worthy of REVERSAL with prejudice.

Petitioner further contends that the Respondent has failed to properly argue and address the claims that WERE presented and decided, and instead to simply respond with a blanket denial of the issues raised by Petitioner. The Petitioner request that this Court recognize Respondent's claim for what it is — invalid.

Petitioner prays that this Court Rule favorably on his traverse and points and authorities thereof, and reverse with prejudice OR whatever favorable ruling the Court sees fit to render.

Respectfully Submitted this 19th day of August 2008. California State Prison - Solano in VACAVILLE, CALIF.

Date: August 19, 2008            Ronald D. Jackson

15.

1    Q.   With regards to your seeing the Defendant, at

2   some point later you were contacted by the police --

3   I'm skipping ahead a little bit.  Were you able to give

4   the police a description of the Defendant?

5        A.   Yes.

6        Q.   Were you able to not just describe his

7   physical characteristics but what he was wearing that

8   day?

9        A.   Yes.

10       Q.   And what was he wearing?

11       A.   He was wearing -- I couldn't depict the

12   color, but it was shorts and dark -- they were dark,

13   dark T-shirt and shorts.

14       Q.   And when you turned to see the Defendant, was

15   that the last time you saw the Defendant that day, when

16   that one glance over your -- over your shoulder?

17       A.   Well, no.

18       Q.   Can you describe for us sort of your

19   observations of the Defendant from that point on.

20       A.   Well, the only thing that I saw is after I

21   got to the top of the landing, it's -- I saw the door

22   open and close again.

23       Q.   Did you see him go through it?

24       A.   I saw a figure but I couldn't because the

25   light -- the sun was right on that door and I couldn't

26   see.  I could see shadows and the door when the door

321

1   opened and light came through and I could see, you

2   know, that he had left through the door.

3       Q.   Okay.  With regards to your initial view of

4   the Defendant, at that point when you -- that initial

5   view when you first heard your name, were you able to

6   make out the Defendant's features?

7       A.   Yes.

8       Q.   And are you certain that it was the Defendant

9   that you saw?

10      A.   Yes.

11      Q.   You have said that you began to run up the

12  stairs.

13      A.   Yes.

14      Q.   At some point during the course of your

15  flight from that particular area, did you hear a noise?

16      A.   Yes.

17      Q.   Can you describe the noise that you heard.

18      A.   Like two pops, pop, pop.

19      Q.   And was -- could you determine or could you

20  figure out sort of where the noise was coming from?

21      A.   Yes.

22      Q.   Where was the noise coming from?

23      A.   The stairwell.

24      Q.   What did you think was happening?

25      A.   I didn't know.  I just -- I didn't know what

26  it was.  And, I mean, in my mind I thought it might be

322

1 | gunshots but I didn't know, I've never heard a gun so I
2 | was very confused.

3 |     Q.   Have you heard a gun being fired on TV?

4 |     A.   Yes.

5 |     Q.   Did it sound like that?

6 |     A.   Not -- it wasn't as loud as it sounds like on
7 | TV, that's -- yeah, I don't know how to describe it so
8 | that's why I wasn't sure.  It sounded like almost like
9 | a loud firecracker going off.

10 |     Q.   Okay.  And, Ms. Webster, did you see anything
11 | to suggest that the Defendant had firecrackers in his
12 | hands?

13 |     A.   No.

14 |     Q.   Did you see a gun in his hands?

15 |     A.   No.

16 |     Q.   Okay.  And when did you hear that noise?

17 |     A.   When I got to the top of the landing.

18 |     Q.   Was it -- and with regards to how many times
19 | you heard that noise, was it two times?

20 |     A.   Two times.

21 |     Q.   And when you got to the top of the landing,
22 | Ms. Webster, and you heard those noises, what did you
23 | do?

24 |     A.   Well, it happened at the same time I gotten
25 | to the landing and then I thought he was following me,
26 | and as I turned around to see if he was behind me, at
                323

1      Q.    Deputy Woollum, as it relates to your duty or

2  your responsibilities during the course of that

3  investigation, was one of them to look for evidence of

4  gunfire in a stairwell that runs sort of down the center

5  near 4191 George Avenue?

6      A.    Yes, it was.

7      Q.    I want to show you some photographs.  First off,

8  let's start with People's No. 4 for identification.

9          With regards to People's No. 4, does that depict

10  at least a portion of the stairwell that you were asked to

11  take a look at and inspect for any evidence of gunfire?

12      A.    Yes, it does.

13      Q.    Okay.  As it relates to evidence of gunfire,

14  would one of the things that you would be looking for is

15  bullet holes?

16      A.    Yes.

17      Q.    And did you find any holes?

18      A.    No, we did not.

19      Q.    Was one of the things you might look for is

20  expended shell casings?

21      A.    Yes.

22      Q.    Did you find any expended shell casings?

23      A.    Not at all.

24      Q.    Okay.  And did you find a gun?

25      A.    No.

26      Q.    Okay.  Deputy Woollum, as it relates to the

                                                              191

1  evidence, did you find any evidence that a gun had been

2  fired from that location?

3       A.   No, I did not.

4       Q.   I am going to ask you kind of a strange question

5  here.  Deputy Woollum, as it relates to firecracker usage,

6  had you found any evidence whatsoever that firecrackers

7  had been lit from that area?

8       A.   No, not at all.

9       Q.   Did you find any firecracker paper?

10      A.   No.

11      Q.   Did you find any matches?

12      A.   No.

13      Q.   Deputy Woollum, as it relates to your

14 investigation, did you look -- did you just limit your

15 examination of the scene to that stairway or did you look

16 in surrounding areas for evidence of firearm discharge?

17      A.   Officer Shabatura and I conducted a search of

18 the entire complex at 4191 George Avenue, completed the

19 front of the complex, the stairwell, the carport area

20 adjacent to the stairwell and the parking area behind it.

21      Q.   And did you examine any of the trees out in

22 front of 4191 George Avenue to see if maybe a bullet had

23 lodged itself in the tree?

24      A.   Yes, we did.

25      Q.   Did you find any evidence that the bullet had

26 lodged itself in the tree?

192

San Mateo Police Department
Narrative Supplement

Report No. 04-0628-031

04-0628-031

| Code Section | Time | Date | Original Investigating Officer | Original ☒ |
|---|---|---|---|---|
| 166(c)(1)PC | 1725 hrs | 06-28-04 | Klein | Supplement ☐ |

18 **INVESTIGATION:**
19
20 On this date (06-28-04) I responded to ▓▓▓▓▓▓▓▓▓ on the reports of shots fired and a
21 woman screaming. When I arrived, I met with Gregorio Pablo Farron. When asked if he had
22 seen anything, Gregorio said, "No." When asked he did see, Gregorio said that he heard what
23 sounded like two gunshots and then he heard a female yelling, "Help" and "Call the police."
24 Gregorio said when he went outside, he was a female subject on the ground, directly in front of
25 the stairs to ▓▓▓▓▓▓ venue. When he approached the female subject, Gregorio said she
26 told him that her ex-boyfriend had shot at her. Gregorio said the female subject appeared to be
27 agitated and when he asked her if her ex-boyfriend was still in the area, she told him that she
28 believed her ex-boyfriend had left out the back of the complex.
29
30 After speaking to Gregorio, I contacted and spoke to Jane Carol Webster. When asked what
31 had happened, Jane said she had arrived home at approximately 1730 hrs. Jane said after she
32 parked her vehicle in the carport, she started towards the stairs, which led her to her apartment.
33 Jane said while she was climbing the stairs, she heard someone say her name. Jane said when
34 she looked behind her, she saw her ex-boyfriend, who she verbally identified as Ronald
35 Jackson, standing against the stairwell wall.
36
37 Jane said when she saw him, she started to run up the rest of the stairs and towards the street.
38 Jane said as she was running up the stairs she was screaming and asking for someone to call
39 the police. Jane said when she got outside of the apartment complex, she ran down the stairs
40 towards the street. Jane said as she was approaching the street, she heard what she believed
41 to be gunshots. Jane said she did not know where the gunshots came from or if in fact Jackson
42 had a firearm in possession. Jane said when she heard what she described as a "Popping"
43 noise, she "Hit the deck" and laid flat on the sidewalk, which caused an abrasion to her left
44 elbow and the inside web of her right thumb. Jane also complained of pain to her left shoulder.
45 When asked if she wished to be treated for her injuries, Jane said, "No." Jane said she would
46 see her doctor the next day if she was still having any pain or discomfort. Fourteen photographs
47 were later taken by CSO Wylie to document Jane's injuries. When asked, Jane said she did not
48 where Jackson had gone or if he had driven away in a vehicle
49
50 When asked to describe the male subject, Jane said Jackson had short dark hair, a mustache,
51 and was wearing a dark colored T-shirt and shorts. When asked if Jackson had any tattoos or
52 scars that she saw or remembered, Jane said, "No."
53
54 I asked Jane when the last time she had contact with Jackson. Jane said that it had been a
55 couple of months since she had been in contact with him. When asked for details about it, Jane
56 said she believes Jackson tried contacting by telephone and when she did answer it, Jackson
57 said "Jane." After hearing her name, Jane said she hung up the telephone.
58

| Ref SMPD Rpt | | | | Reports to | | |
|---|---|---|---|---|---|---|
| O/S Rpt | | | | | | |
| Reporting Officer C. Klein | | ID # 153 | | DOJ Entry | BOL | Initial Process |
| Supervisor | Badge # | Date | 06-28-04 | Scan Initial | Scan Date | |

San Mateo Police Department
Narrative Supplement

Report No. 04-0628-031

04-0628-031

| Code Section | Time | Date | Original Investigating Officer | Original Supplement |
|---|---|---|---|---|
| 166.4 PC 245 PC | 1729 | 06-29-04 | Officer Klein #153 | X |

40  I met with Webster on the stairway and she was crying, and she was obviously upset. I asked
41  Webster if she needed medical attention and if she had been shot. Webster said she only
42  scuffed her left elbow and she did not need medical attention. Webster said she believed that
43  she was shot at by her ex-boyfriend, Ronald Jackson.
44

45
46  Jackson showed up at her apartment building at the lower level of the stairs near the entrance to
47  the carport and scared her. Webster said she ran away from Webster and she heard at least one
48  or two loud pops, which sounded like gunshots.
49

50  Webster said she did not see Jackson with a gun and she believed that the noise she heard
51  were possibly gunshots, although she couldn't be sure. Webster said when she heard the first
52  loud pop she fell on the walkway on the west side of the building. Webster said when she turned
53  around to look for Jackson, he was gone and she did not know which direction he left or if he
54  was in a car. Webster said she does have an active domestic violence restraining order against
55  Jackson and he was not supposed to be near her.
56

57  Webster said she did not know of any cars that were associated to Jackson or where he was
58  currently living. Jackson said she believed that Jackson was wearing dark clothing and she
59  could not provide a detailed description of his clothing.
60

61
62  Officer Klein and Officer Woollum arrived at the scene and Sergeant Kruger assigned Officer
63  Klein as the investigating officer. Refer to Officer Klein's original report for further details
64  regarding this investigation. Officer Woollum and I checked the area for any possible evidence
65  that was associated to the gunshots with negative results. An area check was made for Jackson
66  with negative results. We checked the area for witnesses and I talked to witness, Anne Cota,
67  who lives at ███████████████ Cota gave me the following statement in summary.
68

69  **WITNESS ANNE COTA'S STATEMENT:**
70

71  Cota said she was in her apartment, which is located above Webster's unit. Cota said she was in
72  her living room when she heard two consecutive loud pops or bangs that sounded like gunshots
73  coming from the westside of her apartment building. Cota said she has never heard gunshots so
74  she couldn't be sure sure if the noises that she heard were actually gunshots. Cota said she also
75  thought the two loud sounded like a piece of metal striking another piece of metal.
76
77
78                                                                 METAL
79
80

| Ref SMPD Rpt | | | Reports to | | |
|---|---|---|---|---|---|
| O/S Rpt | | | | | |
| Reporting Officer S. Shabatura | | ID # 119 | DOJ Entry | BOL | Initial Process |
| Supervisor | Badge # | Date 06-29-04 | Scan Initial | Scan Date | |

**SAN MATEO POLICE DEPARTMENT**
**NARRATIVE SUPPLEMENT**

Page 1  1  Report No. 04-0628-031

| Code Violation | Date | Original Investigating Officer | |
|---|---|---|---|
| 166(a)(4) PC | 6-28-04 | Klein | Original Supplement X |

1  ADDENDUM: On 6-28-04 at 1735 hr I was dispatched to 4⬛⬛⬛⬛⬛⬛ for a restraining order
2  violation with possible gunshots involved. The suspect, Ronald Jackson, had left the scene prior to police
3  arrival. Officer Klein was assigned as the primary investigator. Victim Webster said Jackson had possibly
4  fired a gun towards her from the bottom of the staircase leading from the carport to her apartment. Other
5  witnesses and an adjacent neighbor also stated hearing gunshots from the same area. I searched the
6  staircase area for any expended shell casings. I did not find any.
7
8  I interviewed Gabriela Nocito, a neighbor residing next door to Webster in apartment⬛. She was in her
9  apartment caring for her 19-month daughter when she heard what clearly sounded like two gunshots in
10  succession coming from the stairwell. The stairwell is directly out her front door. Gabriela immediately
11  called 9-1-1 as she looked out through her front door. She heard Webster scream something as she was
12  getting up from the sidewalk about 20' from Gabriela's door. Webster's purse and some contents were
13  laying on the ground by her feet. Webster yelled, "call the police". Other people began approaching
14  Webster. Gabriela remained in her apartment talking to the police dispatcher. She did not see Jackson at all.
15  She has seen him on previous occasions at Webster's apartment but doesn't know him.
16
17  DISPOSITION:  . Attach to Original report.
18
19

| Ref SMPD Report: | | | O/S Report: | | | |
|---|---|---|---|---|---|---|
| Reporting Officer: Dennis Woollum | | Badge #: 114 | Reports to: D.A. | | | |
| Supervisor | Badge #: 5-38 | Date: 6-29-04 | DOJ Entry: | BOL: | | Initial Process: |
| | | | Scan Initial: | | Scan Date: | |

SMPD: CR2 (6/97)

ROBERT DERHAM
ATTORNEY AT LAW
1010 B STREET, SUITE 212
SAN RAFAEL, CA
94960
TEL: 415-485-2945

September 21, 2005

Mr. Ronald D. Jackson
V-70867
State Prison
PO Box 3030
Susanville, CA 96127-3030

     Re: *People v. Jackson*
         Court of Appeal No. A109508

Dear Mr. Jackson:

Regarding your letter of August 22: you claim your trial attorney was incompetent for (i) failing to impeach Erica Smith with a prior inconsistent statement, (ii) failing to call Cesar to establish the time he dropped you at Erica's house on the night of the alleged shooting, and (iii) failing to argue for your complete innocence at trial.

I spoke to Mr. Devoy about these matters. He said Erica Smith's statements were essentially consistent, that any inconsistency would have been very minor. He said she cooperated fully with the defense and did not want to testify against you. As to Cesar, Mr. Devoy said he was aware of Cesar and elected not to call him, probably because Cesar changed his story. Mr. Devoy said he would check with his investigator to establish exactly why he decided not to call Cesar. Finally, as to arguing for innocence, Mr. Devoy said there was no doubt the jury was going to convict you of a crime, the only question was which crime – assault or attempted murder. Attempted murder is far more serious because it carries the 25-to-life firearm enhancement with it, whereas assault does not. Therefore, he argued that if you in fact committed the crime, the crime committed was assault, not attempted murder.

I have tried twice to reach Cesar at the numbers you provided. He does not answer and has not returned my calls, although I have left messages asking him to do so.

Based on my review of the record and my interview of Mr. Devoy, I do not see any grounds for a habeas petition based on ineffective assistance of counsel. He performed

Mr. Ronald Jackson
September 21, 2005
Page 2

a reasonable investigation, was aware of the facts of the case, and made reasonable
tactical decisions based on the information he had. Therefore, I will not be filing a
habeas petition. If you wish to file a petition, you must do so on your own.

Sincerely,

Robert Derham
Attorney at Law

San Mateo Police Department
Narrative Supplement

Report No. 04-0628-031

04-0628-031

| Code Section | Time | Date | Original Investigating Officer | Original |
|---|---|---|---|---|
| 166.4 PC   245 PC | 1729 | 06-29-04 | Officer Klein #153 | Supplement   X |

121 Garrett told me that Smith was currently with her at her home and Smith could provide me with
122 more detailed information her conversation with Jackson.
123
124 I talked to Smith on the phone and she gave me the following statement in summary:
125
126 **WITNESS ERICA SMITH'S STATEMENT:**
127
128 Smith said on 6-29-04 at about 0945 hours, Jackson showed up at her home unexpectedly.
129 Jackson said he was tired and he told Smith that he had walked to her home from the area of
130 25th Avenue and El Camino Real. Jackson said he wanted to use the phone and he said that he
131 wanted to phone a District Attorney by the name of "Greg." Smith said Jackson was angry and
132 she wanted to get him out of the house. Smith said at about 1145 hours, she told Jackson that
133 she had to do some errands and she had Jackson go with her. Smith said she drove to Palo Alto
134 and she dropped Jackson off at a bus stop near Santa Cruz Avenue and El Camino Real.
135
136 Smith said she got out of her car and gave Jackson a hug. At that time Jackson told her that he
137 did something bad and he had visited Jane. Jackson said that he shot at Jane twice and he
138 didn't know if he killed her. Smith said Jackson began crying and he he looked very scared.
139 Smith tried to convince Jackson that he needed to turn himself into the police and Jackson said
140 he would never go to the police. Jackson told Smith that she would never see him again.
141
142 Smith said she left Jackson at the bus stop and she immediately phoned Garret to tell her about
143 her conversation with Jackson.
144
145 Smith said she did not know if Jackson had a gun in his possession and she did not feel any
146 type of weapon on his person when she hugged him.
147
148 Smith described Jackson wearing a dark blue t-shirt with unknown graphics on the back, light
149 blue jean shorts, socks and athletic shoes. Smith said  Jackson also had a noticeable fresh
150 laceration on either his left or right calf.
151 **End of statement.**
152
153 Garrett and Smith had no further information as to where Jackson could be living. Garrett and
154 Smith said they will phone the police if they receive any information as to the whereabouts of
155 Jackson.
156
157
158
159
160

— Bus STOP, GET OUT
— TOLL STORY
— STRIKE IN 1 ST 1927
— TOLD JO NO BO LOFT  ME TO
    EVER KNOW THAT
— AFTER 3" ME PHASE 1

| Ref SMPD Rpt | | | Reports to | | |
|---|---|---|---|---|---|
| O/S Rpt | | | | | |
| Reporting Officer | | ID # | DOJ Entry | BOL | Initial Process |
| S. Shabatura | | 119 | | | |
| Supervisor | Badge # | Date   06-29-04 | Scan Initial | Scan Date | |

## San Mateo Police Department
### Narrative Supplement

Report No. 04-0628-031

04-0628-031

| Code Section | Time | Date | Original Investigating Officer | Original |
|---|---|---|---|---|
| 166(c)(1) PC | 1725 hrs | 06-28-04 | Klein | Supplement ☒ |

82 During this time Erica's little sister Paige, had called their mother and told them that their uncle
83 was at the house. According to Erica, their uncle is not allowed in the house and when her
84 mother found out that he was there, she was insistent that he leave.
85

86 Erica said she then told her uncle that he had to leave, however he could come with her on her
87 errands. Erica said while he was in the car with her, Ronald told her that the District Attorney
88 was trying to hold something over his head and he wanted to, "Talk to the mother fucker."
89 Ronald then told Erica that the District Attorney wants to give him another "Four years."
90

91 Ronald then turned his attention to the family and started asking Erica about them. Erica said
92 she did not want to tell her uncle anything about the family or where they were, so she told him
93 that she was no longer in contact with them. Ronald then told Erica about the places he had
94 been staying and that he now had no where else to go.
95

96 Erica said that Ronald asked to use her cell phone but she did not know who he was tying to
97 call. Erica thought that maybe he would try to call his probation officer or the district attorney.
98 Erica said that at about 1200 hrs, he was still with her. Erica told him that she needed to go
99 since she was supposed to meet with her mother. Ronald then asked to speak with Erica's
100 mother as soon as he could because, "Tomorrow would be too late."
101

102 After speaking to her mother on the phone, Erica said she dropped Ronald off at the train station
103 in Palo Alto. As he was leaving, Erica said that Ronald told her that, "This will be the last time
104 you will ever see me again." Erica said Ronald was crying as he said this. Ronald continued,
105 telling Erica that he had gone to see Jane and he did not know if she was alive or dead. When
106 asked what he meant by that, Ronald told Erica that he had taken one or two shots at Jane and
107 he did not know if she was alive or dead.
108

109 Erica said when she hugged her uncle goodbye, she did not feel the weapon on him. At one
110 point, Ronald told Erica that he would never go back to jail.
111

112 When asked if I could speak to either her mother or her father, Erica said her father was
113 sleeping and her mother was out of town. Erica arranged with me to speak with her father
114 tomorrow (07-15-04) when I came on duty. Erica then gave me her mother's cell phone number
115 so I could speak with her.
116
117
118
119
120
121
122
123 Kenneth Smith

| Ref SMPD Rpt. | | | Reports to | | |
|---|---|---|---|---|---|
| DIS Rpt. | | | | | |
| Reporting Officer C. Klein | | ID # 153 | DOJ Entry | BOL | Initial Process |
| Supervisor | Badge # | Date 07-15-04 | Scan Initial | Scan Date | |

1       **PROOF OF SERVICE BY MAIL**

2       (CCP §§1013(a), 2015.5; 28 U.S.C. §1746)

3

4       Case Name  : *Ronald D. Jackson*

5       Case No.   : *C 08-1202 JSW (PR)*

6

7       I, *Ronald D. Jackson*, hereby declare that I am over the age of 18,
        the petitioner in the above-entitled cause of action, my address as an inmate is :

8       P.O Box 4000 / Vacaville, CA 95696-4000.

9

10      On *August 19, 2008*, I delegated to prison officials the task of mailing,
        via the institution's internal mail system, (*Houston v. Lack*, 487 US 266 [101 L.Ed.2d 245; 108

11      S.Ct. 2379] (1988) the below entitled legal document(s):
        *Petitioners TRAVERSE : And Points And*

12      *Authorities, in support of Relief.*

13

14

15
        by placing said documents in a properly addressed and sealed envelope, with postage fully pre-
16      paid and obtained the signature and date of the officer in turn on the sealing flap of the above-
        mentioned envelope at Facility "*1*", Housing Unit # *1-103* CSP-Solano  for which were
17      addressed as follows:

18      *The united States Dist. Court* / *Office of the*
        *Northern Dist. of California* / *Attorney General*
19                                              *S.F. Office*
        *450 Golden Gate Ave.* / *455 Golden Gate Av. 11000*
20      *Box 36060* /              *S.F., CA.*
21      *San Francisco, CA.* /
22          *94102*          /        *94102-3664*
        I further declare under penalty of perjury, under the laws of the United States and the
23      State of California, that the foregoing is true and correct to the best of my knowledge and
        recollection herein and that this declaration was executed at California State Prison
24      Vacaville, this *19* day of *Aug.*          .

25

26

27                                                              , Declarant